**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIEL YANNES, Individually and on Behalf of All Others Similarly Situated, | CIVIL ACTION NO.: 20-3349 (JGK) |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| SCWORX CORPORATION and MARC S. SCHESSEL, | |
| Defendants. | |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF**
**FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page(s)**

I.      PRELIMINARY STATEMENT ................................................................ 1

II.     JURISDICTION AND VENUE ............................................................. 5

III.    PARTIES ................................................................................................ 6

    A.      Plaintiff ......................................................................................... 6

    B.      Defendants .................................................................................... 6

IV.     BACKGROUND FACTS ....................................................................... 7

    A.      Defendant Schessel's Professional Career Has Been Marred By
        Fraudulent or Improper Conduct ............................................... 7

    B.      Defendant Schessel Founded His Own Software Company .................. 9

    C.      In Response to the COVID-19 Pandemic, SCWorx Announced
        Expansion of Operations ............................................................ 9

V.      DEFENDANTS CAPITALIZED ON THE GLOBAL CRISIS TO
    MISREPRESENT THE COMPANY'S FINANCIAL PROSPECTS
    WITH A "BOGUS" COVID-19 TEST DEAL ................................... 10

VI.     THE TRUTH IS REVEALED ............................................................ 15

VII.    ADDITIONAL EVIDENCE OF SCIENTER .................................... 19

VIII.   LOSS CAUSATION/ECONOMIC LOSS ....................................... 20

IX.     CLASS ACTION ALLEGATIONS .................................................. 21

X.      PRESUMPTION OF RELIANCE .................................................... 23

XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ............... 24

XII.    CLAIMS FOR RELIEF .................................................................... 25

    COUNT I:  For Violation of Section 10(b) of the Exchange Act and
    Rule 10b-5 Against All Defendants ................................................ 25

    COUNT II: For Violation of Section 20(a) of the Exchange Act
    Against Defendant Schessel ........................................................... 26

XIII.   PRAYER FOR RELIEF ................................................................... 27

i

XIV.   JURY DEMAND ........................................................................................................... 27

1.     Lead Plaintiff Vy Nguyen ("Plaintiff" or "Mr. Nguyen"), by and through his undersigned counsel, on behalf of himself and all others similarly situated, alleges the following based upon the investigation by Plaintiff's counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.   The investigation by counsel included, among other things: (i) review and analysis of the public filings with the U.S. Securities and Exchange Commission ("SEC") by SCWorx Corporation ("SCWorx" or the "Company"); (ii) review and analysis of corporate press releases, disclosures and media reports issued and disseminated by the Company; (iii) review of other publicly available information concerning SCWorx, including transcripts of public investor presentations and conference calls; (iv) consultation with experts; and (v) review and analysis of the trading data relating to the price and volume of SCWorx common stock.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of himself and the class he seeks to represent, Plaintiff alleges as follows.

## I.     PRELIMINARY STATEMENT

2.     This is a securities class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 against SCWorx and Marc S. Schessel, its chief executive officer (the "Action").   The Action is brought on behalf of a class consisting of all persons who purchased or otherwise acquired SCWorx common stock between April 13, 2020 and April 17, 2020, inclusive (the "Class Period").

3.     SCWorx has historically been a provider of supply chain management software and related data analytics for healthcare providers.

4.     In the first quarter of 2020, as America fell into the grips of the novel coronavirus disease pandemic ("COVID-19") sweeping the globe, Defendants saw an opportunity to capitalize

on the urgent need for certain medical supplies and the extreme uncertainty in the medical supply marketplace. Thus, in March 2020, Defendants announced they would expand operations to include the distribution of urgently needed medical supplies, claiming that the Company's access to supply chain data made it uniquely capable of meeting such demands.

5.      On April 13, 2020, Defendants announced a massive deal, with a total value of up to $840 million, to sell COVID-19 rapid test kits to a virtual healthcare provider named Rethink My Healthcare. Defendants stated that Rethink My Healthcare had signed a committed purchase order for two million test kits in the first week, with provision for additional weekly orders of two million kits per week for 23 weeks, valued at $35M per week.

6.      This would have been a huge deal for any company—as an analyst later described, "[t]he sheer size of the previously unannounced order had the potential to single-handedly alter the course of the ongoing national fight against the novel coronavirus." But for SCWorx, a company with a market cap of just $17 million and reported tangible assets of only approximately $1.2 million as of March 31, 2020, it was an exceptionally important deal. In response to Defendants' announcement, the Company's share price skyrocketed from $2.25 per share to $12.02 per share—***more than quintupling***—on extremely high volume of over 96 million shares.

7.      But doubts arose very quickly regarding the validity of the deal. Prompted by the five-fold stock price leap on volume "which is ridiculous when one bears in mind that the number of outstanding shares does not even reach 8 million," Utopia Capital Research examined the Company's announcement and reported numerous "red flags," including: "atrocious financials, dilution, a so-called 'dubious' past as an MMA (mixed martial arts) promot[er] that settled a securities violations class action lawsuit, a reverse merger involving thousands of cheap shares, [and] press releases making hard to believe claims[.]" The report found Defendants' purchase

order announcement was "very difficult to believe in light of the fact that the number of COVID-19 test[s] carried out in the USA amount[s] to only 298,499 since January 21, 2020" and because the purported purchaser was a small company specializing in virtual healthcare services.

8.      In response to this report, SCWorx's common stock closed down 30% at $8.45 per share on April 14, 2020, on high volume of over 18 million shares.  But SCWorx shares continued to trade at artificially inflated prices because Defendants reaffirmed and continued to tout the monumental purchase order.

9.      For instance, on a conference call with analysts and investors on April 15, 2020, Defendant Schessel claimed that he had "***spent weeks researching over 30 product different [sic] lines, distributors, intermediaries until I found an actual manufacturer that had a kit that appeared to me at least to have all the attributes I was looking for[.]"*** Those attributes purportedly included "the proper FDA authorizations under the emergency authorization act, was not a Chinese or South Korean manufacturer, ***was well on its way towards getting full FDA clearance[,] and had enough capacity on his line where I could purchase 25% of his capacity with options to grow that over time***."  Defendant Schessel further reaffirmed the expected receipt of the first two million rapid detection kits "in about two weeks," and thereafter two million test kits per week.

10.      After the market closed on April 16, 2020, Defendants filed a Form 8-K with the SEC regarding the "Entry into A Material Definitive Agreement," which reiterated the terms of the previously-announced purchase order and revealed for the first time information about the purported supply agreement. Specifically, it identified the supplier as ProMedical Equipment Pty Ltd. ("ProMedical"), and indicated that the supply agreement was for 52 million tests at $13 per test, with 50% payment required at the time of order placement, and the remaining 50% due upon completion of the order and prior to shipping.

11.     However, with this critical new information about the purported test kit supplier, on April 17, 2020, Hindenburg Research issued a report, "SCWorx: Evidence Points to its Massive COVID-19 Test Deal Being Completely Bogus, Price Target Back to $2.25 Or Lower." The report concluded that Defendants' test kit deal was a "scam" based on numerous "red flags." Among other things, the report noted that: (1) SCWorx is a tiny company headquartered in a Regus rental office, whose CEO, Defendant Schessel, "has a checkered past;" (2) Promedical was recently accused by a major COVID test manufacturer of "fraudulently mispresent[ing] themselves" as sellers of its COVID-19 tests, and Promedical's CEO formerly ran another business accused of defrauding its investors and customers; and (3) Rethink My Healthcare is a small virtual healthcare company started by a 25-year-old in August 2018, which did not appear capable of handling up to $840 million in test kits.

12.     In light of the foregoing and the conclusion that the deal was "completely bogus," the report anticipated that SCWorx's share price "could move far lower than $2.25 if/when regulators investigate the company's potentially nefarious business practices at a time when our country and its citizens are arguably at their most vulnerable."

13.     In response to this news, SCWorx's share price fell by almost 14% from its opening price on April 17, 2020 of $7.77, on high volume of more than 14 million shares, to close at $6.72. The stock price continued to tumble on the next trading days, April 20-21, 2020, by $0.97 or about 15% from the closing price on April 17, 2020, to close at $5.75 per share on April 21, 2020, on unusually heavy trading volume.

14.     The SEC halted trading in the stock effective April 22, 2020 due to "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace" related to the purported COVID-19 test kit deal.

15.     On April 30, 3030, Defendants admitted that ProMedical could not supply the required tests, and consequently, the purchase order and supply agreements were terminated.

16.     Throughout the Class Period, Defendants' statements about the COVID-19 test kit deal were materially false and misleading because Defendants knew or recklessly disregarded that: (i) the Company's customer, Rethink My Healthcare, was a small company that was unlikely to be able to pay for or handle the hundreds of millions of dollars in test kit orders provided for in the purchase order; (ii) the Company's COVID-19 test kit supplier, ProMedical, could not supply the quantity or quality of tests described in the purchase order or supply agreement; and (iii) as a result, the Company's disclosures regarding the purchase order were either materially misstated or entirely fabricated and the Company's business prospects were materially misstated.

17.     As a result of these misstatements and omissions, and the precipitous decline in the market value of the Company's securities when the truth was revealed, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise pursuant §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331, 1337 and 1367.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b) and (c).  SCWorx is headquartered in this District.

20.     Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In connection with the acts, transactions, and conduct alleged herein, Defendants directly

and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Plaintiff

21.     Mr. Nguyen, as set forth in the certification filed on June 29, 2020 (ECF No. 14-2), which is incorporated herein by reference, purchased SCWorx stock during the Class Period and has been damaged thereby.

### B.   Defendants

22.     **Defendant SCWorx** is a Delaware corporation that is headquartered at 590 Madison Avenue, 21st Floor, New York, New York, 10022. The Company was formerly known as Alliance MMA, Inc., until it acquired SCWorx Corporation effective February 1, 2019 in a stock-for-stock exchange transaction and changed its name to SCWorx Corporation.  SCWorx's stock trades on the Nasdaq under the ticker symbol "WORX."

23.     On March 16, 2020, in response to the COVID-19 pandemic, SCWorx established a wholly-owned subsidiary, Direct-Worx, LLC, through which Defendants purportedly endeavored to distribute certain high-demand medical equipment to healthcare providers.

24.     **Defendant Marc S. Schessel** ("Schessel") is the Company's founder, Chairman, and CEO throughout the Class Period and to the present.  Defendant Schessel signed SCWorx's SEC filings during the Class Period and participated in the Company's earnings conference call described herein.  Defendant Schessel possessed the power and authority to control the contents of the press releases, investor and media presentations, and all filings SCWorx made with the SEC during the Class Period.  Defendant Schessel was a direct and substantial participant in the fraud.

## IV.    BACKGROUND FACTS

### A.    Defendant Schessel's Professional Career Has Been Marred By Fraudulent or Improper Conduct

25.    From approximately 1997 to 2000, Defendant Schessel was employed by Continuum Health Partners and Beth Israel Medical Center, and was the Vice President of Materials and Management for Beth Israel at the time of his departure.

26.    In connection with that position, in or about February 2002, Defendant Schessel became the subject of a fraud investigation by the Medicaid Fraud Control Unit of the New York Office of the Attorney General ("NYAG"). That investigation primarily concerned a bribery-theft scheme in which Schessel's boss, Donald Modzelewski, allegedly accepted almost $2 million in bribes to steer $11 million in contracts to another individual, Thomas Colucci, via Colucci's various businesses. The two also allegedly stole more than $2 million from Beth Israel and another hospital using fraudulent invoices.[1] According to NYAG records, Defendant Schessel was interviewed in February 2002 in connection with the investigation. In an NYAG memorandum describing the interview, the investigator "informed Schessel that the Attorney General's Office had copies of checks made out to him from Colucci and his companies . . . totaling approximately $545,043.00." In response, Defendant Schessel "advised that the monies constituted consultant work done by him for Colucci[.]" However, when confronted with his prior statement that Colucci's companies were unfamiliar to him, "Schessel advised that he should obtain an attorney."

27.    In a bill of particulars in the case against Schessel's boss and Colucci, the NYAG stated, "Marc Schessel was a participant in the conspiracy to steal from Continuum Health

---

[1] For more information regarding this matter, see the NYAG press release at: https://ag.ny.gov/press-release/2003/new-york-city-hospital-executive-and-consultant-charged-multimillion-dollar-bribe; *see also*, https://www.nytimes.com/2003/05/31/nyregion/two-are-indicted-in-hospital-bribery-case.html.

Partners." He was not, however, charged directly for his purported participation in the scheme, but rather, was charged with tax evasion for failure to pay income tax on the monies he received.

28.     In August 2003, Defendant Schessel pled guilty to the felony tax evasion charge. In connection with the guilty plea, he executed an Affidavit of Confession of Judgment in which he acknowledged his responsibility for diverting a $100,000 rebate that should have been paid to Continuum to one of Colucci's businesses instead, and he agreed to pay that amount in restitution to Continuum.[2]

29.     Not long after his guilty plea for tax evasion, on November 26, 2003, another former employer, Global Healthcare Exchange, Inc., filed a complaint against Defendant Schessel—and subsequently won a judgment against him for more than $16,000—for failing to reimburse the company for personal expenses charged on a company credit card.

30.     From 2003 through July 2012, Defendant Schessel worked for Deman Data Systems ("DDS") as sales manager and president, with job responsibilities that included sales, marketing, and revenue generation, according to court filings. DDS provided software for supply chain management and optimization in the healthcare industry.

31.     In July 2012, DDS terminated Defendant Schessel's employment. In November 2012, DDS filed suit against him, alleging fraud and theft, among other claims, related to alleged misappropriation of trade secrets, solicitation of DDS customers, and failure to disclose Defendant

---

[2] Specifically, the Affidavit stated:

> During the period December 1998 to June 1999, I caused a $100,000 rebate payment due to Continuum Health Partners from Allied Office Supplies, Inc., to be instead directed to Advance Graphics Corporation. As a result of my actions, Continuum Health Partners did not receive $100,000 to which it was entitled. I have agreed to make a restitution payment to Continuum Health Partners in the amount of $100,000, payable on or before I am sentenced on the charge currently pending against me of Filing a Fraudulent New York State Tax Return.

Schessel's criminal background. In the course of the litigation, Defendant Schessel admitted in deposition testimony that he had forged signatures on contracts with some DDS customers, and had altered some contracts to inflate the amount it appeared DDS would earn under some contracts. The litigation ultimately settled in 2015.

**B.      Defendant Schessel Founded His Own Software Company**

32.      In 2012, Defendant Schessel founded SCWorx's predecessor, Primrose LLC. Like DDS, Primrose/SCWorx provides supply chain management and optimization software. Specifically, the software purportedly enables a healthcare provider to simplify and organize its supply chain data, allowing the data to be utilized across multiple internal software applications and providing the basis for sophisticated data analytics.

**C.      In Response to the COVID-19 Pandemic, SCWorx Announced Expansion of Operations**

33.      In the early months of 2020, COVID-19 escalated from an isolated disease in Wuhan, China to a global pandemic that shuttered whole countries, pushed hospital systems to the brink of collapse, and dragged the global economy into a recession. The first confirmed case of COVID-19 in the United States was announced by the Centers for Disease Control on January 21, 2020. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic, and the United States declared a national health emergency on March 13, 2020.

34.      In the wake of all this, Defendants saw an opportunity to capitalize on extreme uncertainty in the medical supply marketplace and the urgent need for critical medical supplies. In a press release before the market opened on March 20, 2020, Defendants announced the formation of a wholly-owned subsidiary, Direct-Worx LLC to supply healthcare providers with critical personal protective equipment (PPE). Noting that "supply chains have substantially broken down due to the coronavirus pandemic," the release quoted Defendant Schessel as stating:

9

> SCWorx is in the unique position to provide immediate assistance to our hospital and healthcare provider clients as we have all the necessary healthcare products in our large data array, a list of functional equivalent products and the connections to sourcing vendors for the core PPE our hospitals need, even as certain critical brand name products are sold out via normal sourcing routes.

35.     The press release also stated that Direct-Worx "is now working with more than 1,000 hospitals, state municipalities, and foreign governments in the sourcing and delivery of these incredibly hard to find items."

36.     One week later, Defendants announced Direct-Worx's first deal in a March 27, 2020 press release entitled: "SCWorx Subsidiary Direct Worx Sources One Million Surgical Masks for Existing Large Hospital Customer to Help Maintain Safety for Healthcare Providers Treating Patients Affected By COVID-19 Pandemic."   The announcement did not identify the hospital customer, but stated that an agreement to supply one million surgical masks for $390,000 had been reached. The release again touted the Company's ability to rapidly secure the urgently needed hospital supplies, "positioning us for accelerated growth as a leader in this space," and indicating that the Company expected to announce "similar agreements as the pandemic spreads."

37.     As detailed further below, Defendants' next purported medical supply announcement would concern the COVID-19 test kit deal giving rise to the present action.

## V.     DEFENDANTS CAPITALIZED ON THE GLOBAL CRISIS TO MISREPRESENT THE COMPANY'S FINANCIAL PROSPECTS WITH A "BOGUS" COVID-19 TEST DEAL

38.     Defendants made materially false and misleading statements and omissions concerning the Company's financial prospects arising from a purported deal to sell desperately needed COVID-19 test kits during the Class Period.

39.     On Monday, April 13, 2020, before the market opened, Defendants issued a press release entitled "SCWorx Announces First Installment of Purchase Order For 48 Million COVID-

19 Rapid Testing Units Over Twenty-Four Weeks at $35 Million Dollars Per Week," which stated,

in  pertinent part:

> *SCWorx (Nasdaq: WORX) announced today that it has received a committed purchase order from Rethink My Healthcare, a U.S.-based virtual healthcare network, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week.*
>
> Under the Order, SCWorx will supply Rethink My Healthcare with IgM/IgG Rapid Detection Kits. *SCWorx anticipates receiving the first 2 million rapid detection kits within approximately two weeks.*
>
> "Widespread testing for COVID-19 disease in the United States is absolutely critical for saving lives and reopening our economy," said Marc Schessel, CEO of SCWorx. *"Our substantial purchase order from Rethink My Healthcare will significantly increase the availability of rapid-test kits in the United States. Additional purchase orders currently under negotiation with certain other parties could further increase the U.S. supply of these important tests in the near term."*
>
> About the IgM/IgG Rapid Detection Kit
>
> The COVID-19 Corona Virus IgM/IgG Rapid Test is an in-vitro diagnostic test solely for the qualitative determination of COVID-19's IgM and IgG antibodies in human whole blood, serum, plasma and fingertip blood. This IgM/IgG Rapid Detection Kit is the world's first device that tests for both IgM and IgG antibodies with proven good clinical performance compared with RT-PCR.

40.     In response to the Company's April 13, 2020 announcement, its share price shot up

by $9.77 per share from the previous trading day's closing price of $2.25 per share, to close at

$12.02 per share on extremely high volume of over 96 million shares.

41.     Defendants' statements in the April 13, 2020 press release concerning the COVID-

19 test kit deal were materially false and misleading because Defendants knew or recklessly

disregarded that: (i) the Company's customer, Rethink My Healthcare, was a small company that

was unlikely to be able to pay for or handle the hundreds of millions of dollars in test kit orders

provided for in the purchase order; (ii) the Company's COVID-19 test kit supplier, ProMedical,

could not supply the quantity or quality of tests described in the purchase order or supply

agreement; (iii) as a result, the Company's disclosures regarding the purchase order for COVID-

19 tests were either materially misstated or entirely fabricated and the Company's business prospects were materially misstated.

42.     On April 15, 2020, Defendants touted the test kit deal and provided additional details on a business update conference call with analysts and investors that was previously scheduled "to discuss recent developments and provide a corporate update." On the call, Defendant Schessel discussed the impact of the COVID-19 pandemic on the Company's customers, and asserted that, "[a]s it turns out, *SCWorx's products and business solutions are ideally suited to this time of extraordinary need as demonstrated by recent developments.*"

43.     Turning to the test kit deal, Defendant Schessel stated:

> On Monday of this week, *we announced receipt of a committed purchase order from Rethink My Healthcare, a U.S.-based telemedicine healthcare network, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35 million per week. Under the terms of the purchase order, we will supply Rethink My Healthcare with Point of Care IgM/IgG Rapid Detection Kits that provide immunoglobulin qualitative detection of IGM and IGG antibodies that are specifically generated by the body in response to the SARS COVI-2 infection - a kit targeting the specific antigens on the surface of the virus and providing a simple yes or no result within several minutes.* Prior to this purchase commitment, I had been contacted by a multitude of hospitals, government agencies such as FEMA and folks representing the Federal prisons. With such an incredible demand I asked the hospitals in my buying group – hospitals like Partners Healthcare in Boston and the University of Vermont (who by the way have been deputized to purchase supplies for the entire state of Vermont) to assist me in testing these new point of care test kits among other products, quickly passing the kits to their labs and rapidly responding as to their effectiveness – this allowed me a streamlined product approval platform unheard of in normal operating conditions. *I spent weeks researching over 30 product different lines [sic], distributors, intermediaries until I found an actual manufacturer that had a kit that appeared to me at least to have all the attributes I was looking for – which were a very high sensitivity rating to blood samples, had the proper FDA authorizations under the emergency authorization act, was not a Chinese or South Korean manufacturer, was well on its way towards getting full FDA clearance and had enough capacity on his line where I could purchase 25% of his capacity with options to grow that over time. We anticipate receiving the first 2 million rapid detection kits in about two weeks and thereafter 2 million tests per week* – with the full understanding from Rethink My Healthcare, that due to the incredible demand for these kits, until such a time where we can get more

capacity, we would be splitting up its contract so that critically effected areas – such as the Federal Prisons could access these important items, albeit not in the quantity they require – however enough so that they can commence a program focused at first on the inmates and employees that need them the most – agreements that we are currently working through terms and procedurals.

44.     Defendants' statements about the COVID-19 test kit deal in the April 15, 2020 conference call were materially false and misleading because Defendants knew or recklessly disregarded that: (i) the Company's customer, Rethink My Healthcare, was a small company that was unlikely to be able to pay for or handle the hundreds of millions of dollars in test kit orders provided for in the purchase order; (ii) the Company's COVID-19 test kit supplier, ProMedical, could not supply the quantity or quality of tests described in the purchase order or supply agreement; (iii) as a result, the Company's disclosures regarding the purchase order for COVID-19 tests were either materially misstated or entirely fabricated and the Company's business prospects were materially misstated.

45.     On April 16, 2020, Defendants continued to tout their deal to sell COVID-19 test kits, filing a Form 8-K with the SEC after the market closed regarding the "Entry into A Material Definitive Agreement," which revealed for the first time the purported supplier of the COVID-19 test kits, ProMedical. The 8-K stated as follows:

> Effective April 10, 2020, **_SCWorx, Corp., a Delaware corporation (the "Company"), accepted a purchase order ("Purchase Order") from Rethink My Healthcare ("RMH"), a U.S.-based virtual healthcare network, under which RMH has ordered and the Company is required to deliver two million COVID-19 Rapid Testing Units, at a per unit price of $17.50, with provision for additional weekly orders of 2 million units for 23 weeks (a total of 48 million units)._**
>
> **_On April 10, 2020, concurrently with its acceptance of the Purchase Order, the Company entered into a Supply Agreement ("Supply Agreement") with ProMedical Equipment Pty Ltd. ("Supplier") pursuant to which the Company agreed to purchase and the Supplier agreed to supply an aggregate of 52 million COVID-19 Rapid Testing Units over a six month period, comprised of 2 million units per week, at a per unit price of $13.00, commencing April 24, 2020._** Pursuant to the Supply Agreement, the Company is required to pay 50% down at the time of

order placement, with the remaining 50% due upon completion of order and prior to shipping.

46.    In response to this news, SCWorx's share price increased from the closing price of $6.95 per share on April 16, 2020 to open at $7.77 on April 17, 2020

47.    Defendants' statements concerning the COVID-19 test kit deal in the April 16, 2020 Form 8-K were materially false and misleading because Defendants knew or recklessly disregarded that: (i) the Company's customer, Rethink My Healthcare, was a small company that was unlikely to be able to pay for or handle the hundreds of millions of dollars in test kit orders provided for in the purchase order; (ii) the Company's COVID-19 test kit supplier, ProMedical, could not supply the quantity or quality of tests described in the purchase order or supply agreement; (iii) as a result, the Company's disclosures regarding the purchase order for COVID-19 tests were either materially misstated or entirely fabricated and the Company's business prospects were materially misstated.

48.    On April 17, 2020, Defendants issued a press release entitled, "SCWorx Confirms Plans for Distribution of COVID-19 Rapid Testing Units," which reaffirmed the previously-announced deal, as follows:

> SCWorx Corp. (Nasdaq: WORX) announced today that ***it confirms previously disclosed plans to distribute COVID-19 Rapid Testing Units***. Previously, the company announced receiving a committed purchase order from Rethink My Healthcare, a U.S.-based virtual healthcare network, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week.
>
> Under the previously disclosed purchase order, ***SCWorx will supply Rethink My Healthcare with IgM/IgG Rapid Detection Kits. SCWorx continues to anticipate receiving the first 2 million rapid detection kits within approximately two weeks and looks forward to providing incremental updates as they become available***.

49.    Defendants' statements about the COVID-19 test kit deal in the April 17, 2020 press release were materially false and misleading because Defendants knew or recklessly

disregarded that: (i) the Company's customer, Rethink My Healthcare, was a small company that was unlikely to be able to pay for or handle the hundreds of millions of dollars in test kit orders provided for in the purchase order; (ii) the Company's COVID-19 test kit supplier, ProMedical, could not supply the quantity or quality of tests described in the purchase order or supply agreement; (iii) as a result, the Company's disclosures regarding the purchase order for COVID-19 tests were either materially misstated or entirely fabricated and the Company's business prospects were materially misstated.

## VI.     THE TRUTH IS REVEALED

50.     On April 14, 2020, the morning after Defendants' initial announcement of the monumental purchase order, a securities analyst/short seller, Utopia Capital Research, issued the "SCWorx Short Report" expressing significant doubts about SCWorx's purported deal and management credibility. In particular, the report stated:

> Yesterday, SCWorx Corp.'s share price enjoyed a remarkable parabolic run, increasing by more than five-fold. Volume was also remarkable, exceeding 90 million shares traded, which is ridiculous when one bears in mind that the number of outstanding shares does not even reach 8 million. Given this highly unusual market activity we decided to take a closer look at WORX and unsurprisingly we found enough red flags to warrant putting out a short report. These **_red flags include_**: atrocious financials, dilution, a so-called "dubious" past as an MMA (mixed martial arts) promot[er] that settled a securities violations class action lawsuit, a reverse merger involving thousands of cheap shares, press releases making hard to believe claims, terrible financials and ongoing dilution.

> \*     \*     \*

> WORX's price run yesterday coincided with news that the company had received a "committed purchase order" from Rethink My Healthcare, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week (6). **_This claim is very difficult to believe in light of the fact that the number of COVID-19 test[s] carried out in the USA amount[s] to only 298,499 since January 21, 2020_** (7). **_How will Rethink My Healthcare sell all these tests is a very good question, especially as it is a company that specialises in virtual healthcare services with a somewhat underwhelming website_** (8). **_Yet this is not the only grandiose claim recently made by WORX's management._** On March 27, 2020, the company claimed that its

subsidiary sourced one million surgical masks for "existing large hospital customer", the hospital's name is not specified. (9) And on March 30, 2020, it announced that it had signed a new renewable annual data management contract with one of the Northeast's leading Cancer Institutes, once again the name of the customer is not specified (10).

51.     On this news, SCWorx common stock closed down 30% at $8.45 per share on April 14, 2020, on high volume of over 18 million shares.

52.     On April 17, 2020, Hindenburg Research issued a detailed report entitled "SCWorx: Evidence Points to its Massive COVID-19 Test Deal Being Completely Bogus, Price Target Back to $2.25 Or Lower," which questioned the validity of the deal and Defendant Schessel's integrity.  In a list summarizing their research at the top of the report, Hindenburg stated:

- SCWorx, a nanocap company headquartered in a Regus rental office in New York City, recently announced it had entered into [a] massive $35 million per week deal to buy and re-sell Covid-19 tests, causing its stock to surge 434%.

- SCWorx's CEO has a checkered past, including pleading guilty to felony tax evasion charges and paying a judgement in a lawsuit alleging he submitted fraudulent expense reports.

- The Covid-19 test supplier that SCWorx is buying from, Promedical, also is laden with red flags. Its CEO is a convicted rapist and formerly ran another business accused of defrauding its investors and customers. The CEO was also alleged to have falsified his medical credentials.

- Promedical claimed to the FDA and regulators in Australia to be offering COVID-19 test kits manufactured by large, well-respected Chinese firm Wondfo.

- Wondfo put out a press release days ago stating that Promedical "fraudulently mispresented themselves" as sellers of its Covid-19 tests and disavowed any relationship. We spoke with Wondfo and confirmed there was never any relationship.

- Meanwhile, the *buyer* that SCWorx has lined up for up to $840 million dollars in tests is a virtual healthcare company started by a 25-year-old in August 2018 that looks modestly sized, with only 3 employees and 3 consultants/advisors listed on its team page– hardly the major partner that we believe would be capable of handling hundreds of millions of dollars in orders.

- *Obviously*, we believe the Covid-19 hype surrounding SCWorx is completely bogus and we predict shares will soon return to the $2.25 price level they were at prior to the hype.

- We also think shares risk being halted and ultimately could move far lower than $2.25 if/when regulators investigate the company's potentially nefarious business practices at a time when our country and its citizens are arguably at their most vulnerable. We're offended by how egregious this appears, not only as investors, but as Americans.

53. With regard to Defendant Schessel, the report indicated a pattern of unscrupulous behavior, as follows:

**SCWorx's CEO Has A Checkered Past That Includes Felony Tax Evasion And Allegations Of Submitting Fraudulent Expense Reports**

Marc Schessel serves as both CEO and interim CFO of SCWorx. (The company's earlier CFO was terminated in October and was paid cash and shares as part of a settlement agreement.)

Schessel has a checkered history. A lawsuit by a former employer detailed how Schessel pled guilty to felony tax evasion in 2003. That conviction was described as having been the result of failing to pay income taxes on illicit proceeds from a bribery scheme that led to the indictment of two other individuals.

Previously, another former employer sued Schessel for submitting fraudulent expense reports, which resulted in a judgement against him.

54. Further, expressing doubt regarding the purported purchaser's ability to pay for and utilize or sell the COVID-19 test kits, the report stated:

While there are no publicly available financials for ReThink, we find it difficult to believe that the relatively unknown company – founded less than 2 years ago and offering $60 per month virtual doctors visits – is going to be able to come up with upwards of the $35 million per week it has committed to purchasing from SCWorx.

Further, we can't figure out what the synergies are between a *virtual* healthcare company offering a test that needs to be *physically* administered to people. ReThink's website also notes that you must be a medical or law enforcement professional to purchase a test, narrowing the funnel of those who can place orders from the company.

55.     The report concluded that the deal was a "scam" and noted that the SEC and DOJ had announced investigations into business practices taking advantage of people in relation to the COVID-19 crisis.

56.     In response to this news, SCWorx's share price fell by almost 14% from its opening price on April 17, 2020 of $7.77, on high volume of more than 14 million shares, to close at $6.72. The stock price continued to tumble on the next trading days, April 20-21, 2020, by $0.97 or about 15% from the closing price on April 17, 2020, to close at $5.75 per share on April 21, 2020, on unusually heavy trading volume.

57.     On April 21, 2020, the SEC ordered the suspension of trading in SCWorx securities effective April 22 due to "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace concerning SCWorx including (1) press releases and other publicly disseminated statements, since at least April 13, 2020, about SCWorx's agreement to sell COVID-19 tests, and (2) SCWorx's current report on Form 8-K filed on April 16, 2020, concerning SCWorx's agreement to sell COVID-19 tests."[3]

58.     Defendants subsequently admitted, in a Form 8-K filed with the SEC filed on April 30, 2020, that ProMedical could not supply the required tests, and consequently, the purchase order and supply agreements were terminated:

> Subsequent to entering into the ProMedical Supply Agreement, **substantial concerns have arisen related to ProMedical's ability to fulfill its obligations under the Supply Agreement.** Under the ProMedical Supply Agreement, ProMedical was required to secure the requisite FDA approvals to permit the sale of its test kits in the US which was a condition of the Company's obligation to purchase the test kits. **R[ethink My Healthcare] has since terminated the ProMedical Purchase Order. Based on the foregoing, the**

---

[3] According to Company disclosures, the SEC's suspension of trading expired in May 2020, but trading remained suspended until August 10, 2020 because the Nasdaq initiated a "T12 trading halt" until the Company fully satisfied Nasdaq's request for information.

*Company terminated the ProMedical Supply Agreement on April 29, 2020 and has lined up an alternate supplier, as described below*.

59.     The Form 8-K also disclosed that a board member, Robert Christie, had resigned on April 23, 2020.

60.     In an 8-K filed with the SEC on May 5, 2020, the Company reported that "[o]n April 29, 2020, the employment of James (Tad) Schweikert as the Chief Operating Officer . . . was terminated by mutual agreement."

61.     On June 12, 2020, the Company disclosed that it was cooperating with investigations by the SEC, Nasdaq, the Financial Industry Regulatory Authority, and the U.S. Attorney's Office for the District of New Jersey, the last of which it indicated was "seeking information and documents from the Company's officers and directors relating primarily to the April 13, 2020 press release concerning COVID-19 rapid test kits."

VII.    **ADDITIONAL EVIDENCE OF SCIENTER**

62.     Throughout the Class Period, Defendant Schessel held himself out to investors as the person most knowledgeable about SCWorx's business.  He voluntarily and repeatedly chose to speak about the purported COVID-19 test kit deal throughout the Class Period and, in doing so, either knew or recklessly disregarded that his statements were contrary to the underlying facts alleged herein. Among other statements, Defendant Schessel represented that he "spent weeks" researching the COVID-19 test kit products, distributors, and intermediaries before purportedly signing an agreement with ProMedical, yet with less than 24 hours of research, an analyst uncovered substantial red flags suggesting that ProMedical would not be able to supply the quantity and quality of test kits Defendant Schessel had indicated.

63.     In addition to the allegations set forth above, during the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the

misleading nature of the statements they made, or acted with reckless disregard for the true

information known to them at the time for the reasons discussed above.  In so doing, Defendants

committed acts, and practiced and participated in a course of business that operated as a fraud or

deceit on purchasers of SCWORX's common stock during the Class Period.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

64.     During the Class Period, as detailed herein, Defendants made the material

misrepresentations recited above that artificially inflated the price of SCWorx common stock and

operated as a fraud or deceit on the Class Period purchasers of SCWorx common stock.

65.     When the truth was disclosed and became known to the market, the price of

SCWorx common stock declined precipitously as the prior artificial inflation was removed from

the price of the stock.  As a result of their purchases of SCWorx common stock at artificially

inflated prices during the Class Period, Plaintiff and other members of the Class suffered a

substantial economic loss (i.e., damages under the federal securities laws).  The price decline in

SCWorx common stock was a direct result of the nature and extent of the materially false and

misleading statements and omissions revealed to investors and the market.  Thus, Defendants'

wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by

Plaintiff and the Class.

66.     The truth about SCWorx's COVID-19 test deal and related business prospects was

disclosed through the research reports described below, which were confirmed by subsequent

events.

67.     ***April 14, 2020 Disclosure Event***

a.     On April 14, 2020, Utopia Capital Research issued the "SCWorx Short

Report," which expressed significant doubts about SCWorx's purported deal to supply 48 million

COVID-19 tests, stating it was ***"very difficult to believe in light of the fact that the number of***

***COVID-19 test[s] carried out in the USA amount[s] to only 298,499 since January 21, 2020***." It also questioned how the purchaser would sell so many test kits since it specialized in virtual healthcare services, and questioned management credibility based on a pattern of making "grandiose claim[s]" and other "red flags" identified in the report.

b.      In reaction to this report, SCWorx's stock price fell from its April 13, 2020 closing price of $12.02 per share to $8.45 per share, a 30% drop, on April 14, 2020, on high volume of over 18 million shares.  However, the Company's stock price remained artificially inflated after this partial disclosure of fraud as Defendants continued to tout the purported COVID-19 test kit deal and withhold material information from investors.

68.      ***April 17, 2020 Disclosure Event***

a.      On April 17, 2020, Hindenburg Research issued a detailed report entitled "SCWorx: Evidence Points to its Massive COVID-19 Test Deal Being Completely Bogus, Price Target Back to $2.25 Or Lower," which closely examined the test kit deal, including new information such as the identity of the test supplier and information related to Defendant Schessel's integrity.

b.      In response to the report, the Company's share price fell by almost 14% from its opening price on April 17, 2020 of $7.77, on high volume of more than 14 million shares, to close at $6.72.  The stock price continued to tumble on the next trading days, April 20-21, 2020, by $0.97 or  about 15% from the closing price on April 17, 2020, to close at $5.75 per share on April 21, 2020, on unusually heavy trading volume.

## IX.    CLASS ACTION ALLEGATIONS

69.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired SCWorx common stock during the Class Period, inclusive (the "Class").  Excluded from the Class are: (i) Defendants;

(ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of SCWorx during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) SCWorx's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

70.     The members of the class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of the Company's Report on Form 10-Q for the quarter ended June 30, 2020, SCWorx had 9,490,582 shares outstanding, owned by hundreds of persons.

71.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.      Whether the Exchange Act was violated by Defendants;

b.      Whether Defendants omitted and/or misrepresented material facts;

c.      Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      Whether the Defendants acted with the requisite state of mind;

e.      Whether the price of SCWorx's common stock was artificially inflated; and

f.      The extent of damage sustained by Class members and the appropriate measure of damage.

72.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from the Defendants' wrongful conduct.

73.     Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

74.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.     PRESUMPTION OF RELIANCE

75.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

      a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      b.     The omissions and misrepresentations were material;

      c.     The Company's common stock traded in an efficient market;

      d.     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

      e.     Plaintiff and other members of the Class purchased or otherwise acquired SCWorx common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

76.     At all relevant times, the market for SCWorx common stock was efficient for the following reasons, among others:

      a.     As a regulated issuer, SCWorx filed periodic public reports with the SEC;

b.     SCWorx regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c.     SCWorx common stock was actively traded in an efficient market, the Nasdaq, where the Company's common stock trades under the ticker symbol "WORX."

77.    As a result of the foregoing, the market for SCWorx common stock promptly digested current information regarding SCWorx from all publicly available sources and reflected such information in SCWorx common stock.   Under these circumstances, all purchasers and acquirers of SCWorx common stock during the Class Period suffered similar injury through their purchases or acquisitions of SCWorx common stock at artificially inflated prices, and the presumption of reliance applies.

78.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

79.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.   To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor

24

is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of SCWorx who knew that those statements were false and misleading when made.

## XII.   CLAIMS FOR RELIEF

### COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

80.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a.   Employed devices, schemes and artifices to defraud;

b.   Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

c.      Engaged in acts, practices, and a course of business that operated as a fraud

or deceit upon Plaintiff and others similarly situated in connection with their

purchases of SCWorx securities during the Class Period.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

the market, they paid artificially inflated prices for SCWorx's publicly traded securities.  Plaintiff

and the Class would not have purchased SCWorx securities at the prices they paid, or at all, if they

had been aware that the market prices had been artificially and falsely inflated by the Defendants'

misleading statements.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their purchases of SCWorx

securities during the Class Period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act**
**Against Defendant Schessel**

85.     Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

86.     Defendant Schessel acted as a controlling person of SCWorx within the meaning

of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position,

participation in and awareness of the Company's operations, and knowledge of the statements filed

by the Company with the SEC and disseminated to the investing public, Defendant Schessel had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading.  Defendant Schessel was provided

with, or had unlimited access to copies of, the Company's reports, press releases, public filings

and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.     In particular, Defendant Schessel had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

88.     As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person, Defendant Schessel is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

a.     Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

b.     Awarding Plaintiff and the members of the Class damages, including interest;

c.     Awarding Plaintiff's counsel reasonable costs and attorneys' fees; and

d.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 19, 2020

**KAPLAN FOX & KILSHEIMER LLP**

By: */s/ Laurence D. King*
Laurence D. King
Mario M. Choi
1999 Harrison Street, Ste. 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707

Frederic S. Fox
Donald R. Hall
Melinda D. Campbell
Pamela Mayer
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

*Lead Counsel for Plaintiff and the Class*