UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANIEL YANNES, Individually and On
Behalf of All Others Similarly
Situated,

                Plaintiff,

    - against -

SCWORX CORP., and MARC S. SCHESSEL,

            Defendants.

20-cv-03349 (JGK)

MEMORANDUM OPINION
AND ORDER

---

**JOHN G. KOELTL, District Judge:**

This is a securities action brought on behalf of a putative
class of all purchasers of publicly traded common stock of
SCWorx Corporation ("SCWorx") between April 13, 2020 and April
17, 2020, inclusive (the "Class Period"). The lead plaintiff,
Daniel Yannes, filed a Consolidated Class Action Complaint on
October 19, 2020.

The plaintiff asserted violations of Section 10(b) of the
Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.
§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §
240.10b-5, against SCWorx and Marc S. Schessel, the Chief
Executive Officer of SCWorx, as well as a claim under Section
20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Schessel.
The defendants now move to dismiss the complaint for failure to
state a claim pursuant to Federal Rule of Civil Procedure

1

12(b)(6). For the reasons explained below, the defendants'
motion is **denied.**

I.

The following facts are drawn from the Consolidated Class
Action Complaint ("CCAC") and documents referenced therein and
are accepted as true for the purposes of this motion.

SCWorx, a Delaware corporation with its headquarters in New
York City, is a provider of supply chain management software and
related data analytics for healthcare providers. CCAC ¶¶ 3, 22.
Schessel is the Company's founder, Chairman, and Chief Executive
Officer ("CEO"), both throughout the Class Period and up to the
present. Id. ¶ 24. SCWorx's shares trade publicly on the NASDAQ
exchange under the symbol "WORX." Id. ¶ 22.

In early 2020, COVID-19 escalated to a global pandemic that
"pushed hospital systems to the brink of collapse." Id. ¶ 33. In
response to the urgent need for critical medical supplies, the
defendants announced in a press release on March 20, 2020 the
formation of a wholly-owned subsidiary, Direct-Worx LLC, to
supply healthcare providers with critical personal protective
equipment ("PPE"). Id. ¶ 34.

On April 13, 2020, the defendants announced a deal, valued
at $840 million, to sell COVID-19 rapid test kits to a virtual
healthcare provider named Rethink My Healthcare ("RMH"). Id.
¶ 5. The defendants' press release stated that RMH had signed a

2

committed purchase order for two million test kits in the first week, with provision for additional weekly orders of two million kits per week for twenty-three weeks (the "Purchase Order"), valued at $35 million per week. Id. ¶¶ 5, 39. On news of the deal, SCWorx's share price increased from $2.25 per share to $12.02 per share. Id. ¶ 40.

The following day, Utopia Capital Research, a securities analyst, issued the "SCWorx Short Report" identifying "red flags" about SCWorx and raising doubts about its purported deal with RMH. Id. ¶ 50. The report referenced the SCWorx's "atrocious financials, dilution, [Schessel's] so-called 'dubious' past as an MMA (mixed martial arts) promot[er] that settled a securities violations class action lawsuit, a reverse merger involving thousands of cheap shares, press releases making hard to believe claims, terrible financials and ongoing dilution." Id. The report also noted that the committed purchase order from RMH for two million COVID-19 test kits, with provision for additional weekly orders of two million units for twenty-three weeks, was "very difficult to believe in light of the fact that the number of COVID-19 test[s] carried out in the USA amount[s] to only 298,499 since January 21, 2020" and because RMH was a small company specializing in virtual healthcare services. Id. In response to this report, SCWorx's

common stock closed down 30% at $8.45 per share on April 14, 2020, on over 18 million shares. Id. ¶ 8.

On April 15, 2020, the defendants discussed the COVID-19 rapid test kits deal on a conference call with analysts and investors, during which Schessel told investors that he had "spent weeks researching over 30 product different lines [sic], distributors, intermediaries until [he] found an actual manufacturer that had a kit that . . . had the proper FDA authorizations under the [E]mergency [A]uthorization [A]ct . . . and had enough capacity on [its] line where [he] could purchase 25% of [its] capacity with options to grow that over time." Id. ¶¶ 42-43. On April 16, 2020, the defendants filed a Form 8-K with the Securities Exchange Commission ("SEC"), which revealed for the first time the purported supplier of the COVID-19 rapid test kits was ProMedical Equipment Pty Ltd. ("ProMedical"). Id. ¶ 45. The Form 8-K stated that on April 10, 2020, concurrently with SCWorx's acceptance of a purchase order from RMH, SCWorx entered into a supply agreement with ProMedical (the "Supply Agreement"), pursuant to which SCWorx agreed to purchase and ProMedical "agreed to supply an aggregate of 52 million COVID-19 Rapid Testing Units over a six month period, comprised of 2 million units per week, at a per unit price of $13.00, commencing April 24, 2020." Id.

4

On April 17, 2020, given the new information about the purported test kit supplier, Hindenburg Research issued a report entitled "SCWorx: Evidence Points to its Massive COVID-19 Test Deal Being Completely Bogus, Price Target Back to $2.25 Or Lower" (the "Hindenburg Report"). The Hindenburg Report concluded that, based on certain red flags, the deal was "completely bogus" and a "scam." Id. ¶¶ 52, 55. The Hindenburg Report stated that: (1) Schessel, the Company's CEO had "a checkered past," including pleading guilty to felony tax evasion charges and paying a judgement in a lawsuit alleging he submitted fraudulent expense reports; (2) ProMedical, the purported supplier of the tests, was "laden with red flags," including its CEO's being a convicted rapist who formerly ran another business accused of defrauding its investors and customers and the company was accused of "fraudulently mispresent[ing] itself" as an authorized seller of COVID-19 tests manufactured by a Chinese company Wondfo; and (3) RMH, as a "relatively unknown company . . . founded less than 2 years ago," did not appear capable of "com[ing] up with the upwards of the $35 million per week it has committed to purchasing from SCWorx." Id. ¶¶ 52-54.

In response to the Hindenburg Report, SCWorx's share price fell by almost 14% from its opening price on April 17, 2020 of $7.77 to close at $6.72. Id. ¶ 56. The stock price continued to

fall in the coming trading days by $0.97 or about 15% from the closing price on April 17, 2020, to close at $5.75 per share on April 21, 2020, on unusually heavy trading volume. Id.

On April 21, 2020, the SEC ordered the suspension of trading in SCWorx securities, effective April 22, due to "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace concerning SCWorx including (1) press releases and other publicly disseminated statements, since at least April 13, 2020, about SCWorx's agreement to sell COVID-19 tests, and (2) SCWorx's current report on Form 8-K filed on April 16, 2020, concerning SCWorx's agreement to sell COVID-19 tests." Id. ¶¶ 14, 57.

On April 30, 2020, the defendants filed a Form 8-K with the SEC, in which the defendants admitted that ProMedical could not supply the required tests, and consequently, the purchase order and supply agreements were terminated. Id. ¶¶ 15, 58. The Form 8-K also disclosed that a board member, Robert Christie, had resigned from the board of directors on April 23, 2020. Id. ¶ 59. In a subsequent Form 8-K, on May 5, 2020, SCWorx announced that on April 29, 2020, the employment of James (Tad) Schweikert at the Chief Operating Officer was terminated by mutual agreement. Id. ¶ 60.

The first complaint in this action was filed on April 29, 2020, and after appointment of the lead plaintiff, the CCAC was

filed on October 19, 2020. See ECF Nos. 1, 45. The plaintiff
alleges that between April 13, 2020 and April 17, 2020,
inclusive, the defendants' statements about its COVID-19 rapid
test kits deal were materially false and misleading, causing the
plaintiff and other class members to suffer significant losses,
because the defendants knew or recklessly disregarded that: (i)
SCWorx's customer, RMH, was "unlikely to be able to pay for or
handle the hundreds of millions of dollars in test kit orders
provided for in the purchase order; and (ii) SCWorx's COVID-19
test kit supplier, ProMedical, could not supply the quantity or
quality of tests described in the purchase order or supply
agreement." Id. ¶¶ 16-17.

## II.

In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiff's favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007).[1] The Court's function on a motion to dismiss is "not to
weigh the evidence that might be presented at a trial but merely
to determine whether the complaint itself is legally
sufficient." Goldman v. Belden, 754 F.2d 1059, 1067
(2d Cir. 1985). The Court should not dismiss the complaint if

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all
alterations, citations, footnotes, and internal quotation marks in quoted
text.

the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the

statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015); Silsby v. Icahn, 17 F. Supp.3d 348, 353-54 (S.D.N.Y. 2014), aff'd sub nom. Lucas v. Icahn, 616 F. App'x 448 (2d Cir. 2015).

### III.

The defendants move to dismiss the plaintiff's Section 10(b) and Rule 10b-5 claims on the grounds that the plaintiff has not adequately pleaded (1) the requisite scienter by SCWorx

9

or Schessel, and (2) that the defendants made a materially false statement of fact or omission. The defendants also move to dismiss the plaintiff's Section 20(a) claim against Schessel because the plaintiff allegedly has failed to plead a primary violation of federal securities law by SCWorx.

## A.

To state a claim for securities fraud Section 10-b of the Exchange Act and SEC Rule 10b-5 "a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.), 988 F.3d 157, 167 (2d Cir. 2021).

The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the

10

fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. As to the second method of establishing scienter, "courts have approved of claims when plaintiffs have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Pirnik v. Fiat Chrysler Autos., N.V., 15–CV–7199, 2016 WL 5818590, at *6 (S.D.N.Y. Oct. 5, 2016); see also Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (noting that "an egregious refusal to see the obvious, or to investigate the doubtful," may in some cases give rise to an inference of recklessness).

Courts must conduct the scienter analysis holistically to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences [and] [a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 323–24.

In this case, the defendants argue that the plaintiff has failed to plead scienter adequately because the CCAC does not allege facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. The defendants' principal arguments are that (1) Schessel cannot be held liable for conscious recklessness because he failed to predict that ProMedical would breach the Supply Agreement, and (2) the plaintiff has not identified any information that, at the time SCWorx entered into and publicly disclosed the Supply Agreement with ProMedical, placed Schessel or SCWorx on notice of ProMedical's inability to supply the quantity or quality of tests described in the Supply Agreement.

These arguments are unpersuasive. The defendants are correct that allegations of a defendant's failure to predict future events do not create a strong inference of scienter based on conscious recklessness, see, e.g., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 187 (2d Cir. 2014). However, "securities fraud claims typically have sufficed to state a claim based on recklessness . . . where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or

ignored obvious signs of fraud," Novak, 216 F.3d at 308, which is what the plaintiff has alleged here.

The CCAC does not merely allege that the defendants should have predicted ProMedical defaulting on the Supply Agreement. Rather, the CCAC references information that was publicly available at the time the defendants first announced their COVID-19 test kit deal on April 13, 2020, and that the defendants could have and should have learned in the course of reasonable due diligence about a potential business partner. As referenced in the Hindenberg Report, Wondfo issued an "official statement" on April 5, 2020, stating that it had "seen an infringement activity in connection with a company named [ProMedical] fraudulently misrepresent itself as being authorized . . . to register and distribute" Wondfo's COVID-19 Antibody Test, and clarifying that ProMedical "was not an authorized representative nor distributor of Wondfo in Australia, America, and other countries/districts." See King Decl. Ex. 4, at 8. Furthermore, also based on publicly available information, the Hindenburg Report noted that ProMedical's CEO was a convicted felon and had previously run a company that was accused of defrauding its customers and investors. Id. at 11-12. Given that this information was publicly available and accessible to Schessel prior to the defendants' announcement of its COVID-19 test kit deal, it weighs in favor of an inference

that Schessel either knew about ProMedical's inability to supply

the quantity or quality of tests described in the Supply

Agreement, or showed a reckless disregard for it. See Orthofix,

89 F. Supp. 3d at 618 (scienter inference supported by the

allegation that information regarding the company's finances

were "reasonably available" to the chief financial officer, even

though the plaintiff did not specifically allege that the

officer read the reports containing this information).

Further supporting an inference of scienter are Schessel's

representations to investors that he personally "spent weeks

researching over 30 different lines [sic], distributors,

intermediaries" before finding a test kit manufacturer that

appeared to "to have all the attributes," including proper FDA

authorization and "enough capacity," CCAC ¶ 43, but apparently

failed to detect—or, worse yet, ignored—the red flags that the

analysts at Hindenburg identified in one day. See Blank v.

TriPoint Glob. Equities, LLC, 338 F. Supp. 3d 194, 215 (S.D.N.Y.

2018) (finding circumstances indicative of conscious

recklessness where the complaint alleged that the defendant

failed to investigate or else he would have known about the

fraud at issue all the while assuring the plaintiffs that he

conducted due diligence); Citiline Holdings, Inc. v. iStar Fin.

Inc., 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (finding of

scienter supported where the defendants "are alleged to have

told the investing public that they monitored the value of their portfolio on a nearly real-time basis").

Moreover, the fact that the Hindenberg Report, questioning the validity of the defendants' COVID-19 test kit deal, was published only one day after the defendants' public disclosure of the Supply Agreement with ProMedical weighs in favor of inferring scienter based on recklessness. See In re Salix Pharms., Ltd., No. 14-CV-8925, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (finding that the "ease with which potential acquirers discovered [the defendant's] true inventory levels . . . within days of performing their due diligence" supported a strong inference of scienter); In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (finding an inference of scienter where "in the course of one weekend the overvaluation of assets and underestimation of risk exposure in [the company's] financial statements" was discovered), on reconsideration, No. 07-CV-10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011), and on reconsideration, No. 07-CV-10453, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011).

The plaintiff's scienter allegations are further supported by the "core operations" doctrine, which provides that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements

concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). Because the "core operations" doctrine predated the enactment of the PSLRA, the Court of Appeals for the Second Circuit has "not yet expressly addressed whether, and in what form, the . . . doctrine survives as a viable theory of scienter." Frederick v. Mechel OAO, 475 F. App'x 353, 356 (2d Cir. 2012). But, at the very least, the doctrine can "provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently." New Orleans Emps. Ret. Sys. v. Celestica, Inc., 455 F. App'x 10, 14 n.3 (2d Cir. 2011). The CCAC alleges that SCWorx's test kit deal was "an exceptionally important" one for the Company—given that the deal had a total value of $840 million, the Company "reported tangible assets of only approximately $1.2 million," and announcement of the deal more than quintupled the Company's share price—and that Schessel "held himself out to investors as the person most knowledgeable about SCWorx's business." CCAC ¶¶ 5-6, 62. Therefore, while the importance of the test kit deal to

the Company cannot establish scienter on its own, it supplements the plaintiff's other evidence of scienter.

Therefore, drawing all inferences in the plaintiff's favor, as the Court must, the above allegations support finding that the "danger"—namely, ProMedical's inability to supply test kits as described in the Supply Agreement—was "either known to [Schessel] or so obvious that [Schessel] must have been aware of it," Novak, 216 F.3d at 308, and suffices to allege scienter adequately at this stage of the litigation.

The defendants argue that a stronger competing inference to plaintiff's theory of scienter is that SCWorx was simply duped by ProMedical, or that ProMedical failed to deliver on its obligations, through no fault of the defendants. To establish scienter, the plaintiff's inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." Id. at 324; see also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). Here, the particular allegations that information highlighting ProMedical's inability to supply the quantity or quality of tests described in the Supply Agreement

17

was available to the defendants prior to the announcement of the test kit deal, coupled with Schessel's representations to investors about his involvement in selecting ProMedical as the supplier, and the fact that the Hindenburg Report was issued within twenty-four hours of revealing ProMedical's involvement in the deal make the inference that, at the very least, Schessel consciously disregarded red flags, at least as compelling as the inference that ProMedical duped the defendants.

Moreover, the timing and circumstances of resignations, although not themselves sufficient, can add to a pleading of circumstantial evidence of fraud. Orthofix, 89 F. Supp. 3d at 619; In re Sadia, S.A. Sec. Litig., 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) (crediting termination of chief financial officer and resignation of chairman and vice chairman that occurred less than two weeks after the company's fraud was revealed). Here, within two weeks of the issuance of the Hindenburg Report, SCWorx's board member, Robert Christie, resigned, and its Chief Operating Officer was terminated by mutual agreement, thus adding some further weight to an overall inference of scienter.

In light of the foregoing, a reasonable person would deem an inference of scienter for Schessel "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Furthermore, because the CCAC properly

18

alleges scienter against a key officer of SCWorx, Schessel, it necessarily alleges scienter against SCWorx itself. See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant."); Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc., 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010) ("Because the plaintiffs have successfully pleaded scienter as to . . . Arbitron's then-president, CEO, and chairman, they have also pleaded corporate scienter as to Arbitron."); see also Orthofix, 89 F. Supp. 3d at 619.

Accordingly, the plaintiff has alleged sufficient facts to support a strong inference of scienter with respect to both defendants.

**B.**

The defendants next argue that the plaintiff has failed to adequately allege that the defendants made a materially false statement or omission. The defendants argue that the plaintiff failed to (1) plead facts showing that the allegedly challenged statements were false or misleading when they were made, and (2) plead that the defendants had a duty to disclose the facts that allegedly suggested RMH would be unable to pay SCWorx for the test kits.

Claims brought pursuant to Section 10(b) of the Exchange Act require the plaintiff to plead a material misstatement or omission. See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007). A misrepresentation or omission is material if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision. See Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988). When evaluating an alleged omission, courts consider whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); see also Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996).

The defendants argue that SCWorx's disclosure on April 30, 2020 that it terminated the Supply Agreement because ProMedical could not supply the required tests does not prove that the defendants' earlier statements were false when made. But contrary to the defendants' contention, the plaintiff has not merely attempted to plead "fraud-by-hindsight." Rather, as discussed above, the plaintiff alleges that publicly accessible information indicating that ProMedical could not supply the required tests was available to the defendants prior to SCWorx's

announcement of the Purchase Order on April 13, 2020. Courts in this circuit have held that "[t]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." In re Bear Stearns, 763 F. Supp. 2d at 487; see also In re Atlas Air, 324 F. Supp. 2d at 494 (rejecting defendants' fraud-by-hindsight claim where plaintiffs' allegations that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results sufficiently pleaded fraud); In re Salix, 2016 WL 1629341, at *17.

Nor does the plaintiff's allegation that on April 30, 2020, the defendants admitted that ProMedical could not supply the required tests, make this a fraud-by-hindsight case. "[The Court of Appeals for the] Second Circuit has explicitly recognized that plaintiffs may rely on post-class period data to confirm what a defendant should have known during the class period." In re Vivendi Universal, S.A., No. 02-CV-5571, 2004 WL 876050, at *6 (S.D.N.Y. Apr. 22, 2004). See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir.2001); Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir.2000); Novak, 216 F.3d at 312-13; see also In re Salix, 2016 WL 1629341, at *17 ("Although some of Plaintiffs' allegations are based on events that occurred after the Class Period, Plaintiffs have met their burden of pleading

scienter under the PSLRA, given the events alleged to have that occurred during the Class Period."). Statements provided in defendants' April 30, 2020 Form 8-K, which terminated the test kit deal given doubts as to ProMedical's ability to fulfill its obligations under the Supply Agreement such as securing the requisite FDA approvals, serve to confirm what the defendants were at least reckless in not knowing when the deal was announced on April 13 and when they reaffirmed the deal's legitimacy to investors throughout the class period, namely, the numerous concerns about ProMedical and its leadership. Therefore, the plaintiff has adequately alleged that the defendants made a material misrepresentation.

The defendants also argue that the plaintiff failed to plead an actionable omission by the defendants because the defendants did not have a duty to disclose the red flags that suggested RMH would be unable to pay SCWorx for the test kits, because these facts were already disclosed to the public on RMH's website at the time of the challenged statements.

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5," Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100-01 (2d Cir. 2015) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)), and there is no duty to disclose information that is "equally available to both parties," In re WorldCom, Inc. Sec. Litig., 346 F.Supp.2d 628, 687-88

(S.D.N.Y.2004), or is "widely reported in readily available media," Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014).

In this case, the defendants are correct that they had no duty to disclose the red flags about RMH because they were publicly available. But this argument misses the mark for two reasons. First, the plaintiff did not allege that the failure to disclose the red flags about RMH was an actionable omission. Instead, the plaintiff relied on the red flags about RMH to provide further support for the inference that when the defendants announced the test kit deal, the deal was either recklessly misstated or entirely fabricated. Accordingly, the fact that the defendants did not have a duty to disclose the red flags is beside the point.

Second, while focusing their argument on red flags about RMH, the defendants failed to address the omission that the plaintiff did allege, namely, the defendants' failure to reveal the identity of its test kit supplier, ProMedical, on the same day as it announced its deal with RMH—an omission that the plaintiff argues made the test kit deal appear more legitimate than it was. And while the defendants had no general duty to disclose all material information, "[o]nce a party chooses to speak, it has a duty to be both accurate and complete." Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002). As a

result, "an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008); see also City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011). In this case, the plaintiff alleged that the defendants made a favorable announcement about a significant agreement about COVID test kits while omitting the identify of the supplier, and that this omission was materially misleading to investors. Further, unlike the red flags about RMH that were ascertainable from public sources, the identity of the supplier was not readily available to the market until SCWorx disclosed it several days later.

Accordingly, because the plaintiff has sufficiently alleged the defendants' misrepresentation and omission, the motion to dismiss the Section 10(b) claim is **denied.**

### C.

The defendants argue that Schessel cannot be held liable as a control person under Section 20(a) of the Exchange Act for the alleged securities violations of SCWorx because the plaintiff has failed to establish a primary violation of federal securities laws by SCWorx.

24

Because the plaintiff has alleged a plausible primary violation of Section 10(b) and Rule 10b-5, the defendants' motion to dismiss the plaintiff's Section 20(a) claim is **denied.**

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the motion to dismiss is **denied.** The Clerk of the Court is directed to close docket number 46.

**SO ORDERED.**

Dated:    **New York, New York**
            **June 21, 2021**

                                 **John G. Koeltl**
                      **United States District Judge**